THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: May 5, 2017

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Beds & Bars Limited*

_____

Serial No. 85597669

_____

Michael E. Hall and Mark B. Harrison of Venable LLP,
    for Beds & Bars Limited.

Ronald L. Fairbanks, Trademark Examining Attorney, Law Office 119,
    Brett J. Golden, Managing Attorney.

_____

Before Quinn, Adlin and Masiello,
    Administrative Trademark Judges.

Opinion by Quinn, Administrative Trademark Judge:

Beds & Bars Limited (hereinafter "Applicant") seeks registration on the Principal

Register of the mark **BELUSHI'S** *(in standard character format)* for

> travel reservation, escorting of travellers, car parking,
> courier services, arranging and providing transportation
> for travellers, sightseeing, information services regarding
> travel (in International Class 39); and
>
> hotel, hostel, public houses, restaurant and catering
> services, reservation of temporary accommodation,

boarding houses, cocktail lounges and coffee bars (in International Class 43).[1]

The Trademark Examining Attorney refused registration of Applicant's mark pursuant to Section 2(e)(4) of the Trademark Act, 15 U.S.C. § 1052(e)(4), on the ground that the applied-for mark is primarily merely a surname.

When the refusal was made final, Applicant appealed and requested reconsideration. The Examining Attorney denied the request for reconsideration but failed to address Applicant's alternative amendment to the Supplemental Register. Applicant then filed a request for remand. After the Examining Attorney accepted this alternative amendment, the appeal was resumed on the sole issue of whether Applicant's mark **BELUSHI'S** is registrable on the Principal Register.

By way of additional background, the Examining Attorney, in the first Office Action dated August 8, 2012, raised two refusals, namely, the surname refusal and a refusal under Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a), on the ground that Applicant's mark falsely suggests a connection with John Belushi, "the late, famous actor and comedic entertainer." In the final refusal dated March 21, 2013, the Examining Attorney withdrew the Section 2(a) refusal, and maintained the surname refusal. After Applicant and the Examining Attorney briefed the surname issue, the Board issued a remand order on December 11, 2015. The Board indicated that based on the record a remand was in order pursuant to Trademark Rule 2.142(f) to allow

---

[1] Application Serial No. 85597669 was filed on April 13, 2012, initially based upon Applicant's allegation of a *bona fide* intention to use the mark in commerce under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b). In Applicant's submission of February 11, 2013, Applicant deleted the ITU basis for filing, claimed a continuing *bona fide* intention to use the mark in commerce and amended the application's basis to Section 44(e), 15 U.S.C. § 1126(e), based upon Community Trademark Registration No. 002476141, issued on June 5, 2003.

the Examining Attorney to consider whether registration also should have been refused, in the alternative, under Section 2(c) of the Trademark Act, 15 U.S.C. § 1052(c).[2] More specifically, given the evidence of record regarding the celebrity of Jim Belushi, John's brother, the Examining Attorney was instructed to consider whether registration should be refused on the basis that the mark is the name of Jim Belushi, a particular living individual whose written consent is not of record. The appeal was suspended, and the application was remanded to the Examining Attorney. On January 14, 2016, the Examining Attorney refused registration under Section 2(c) as well. Ultimately, however, the Examining Attorney was persuaded by Applicant's response, and in an Office Action dated February 2, 2017, he withdrew the Section 2(c) refusal. We now consider the merits of the sole issue on appeal, namely, whether the mark sought to be registered on the Principal Register is primarily merely a surname. We affirm that refusal to register.

I.   Statutory refusal: primarily merely a surname

Section 2(e)(4) of the Trademark Act precludes registration of a mark on the Principal Register that is "primarily merely a surname" without a showing of acquired distinctiveness under Section 2(f) of the Act, 15 U.S.C. § 1052(f). A term is

---

[2] In his brief, the Examining Attorney stated: "If the Board feels the proposed mark would be more properly categorized as a false association with John and Jim Belushi, then the undersigned respectfully requests remand of the application so the examining attorney may reinstate the refusal to register under Trademark Act Section 2(a). This refusal would preclude applicant's request in the alternative for registration on the Supplemental Register since Section 2(a) is an absolute bar to registration on either the Principal or Supplemental Register. See TMEP 1203.03." 15 TTABVUE 9. However, the Board normally will not remand an application for consideration of a ground for refusal if the Examining Attorney, as in the present application with respect to Section 2(a), had previously refused registration on that ground and then withdrew the refusal. Trademark Rule 2.142(f); TBMP § 1209.01 (Jan. 2017).

primarily merely a surname if, when viewed in relation to the goods or services for which registration is sought, its primary significance to the purchasing public is that of a surname. *In re Eximius Coffee, LLC*, 120 USPQ2d 1276, 1277 (TTAB 2016); *In re United Distillers plc*, 56 USPQ2d 1220, 1221 (TTAB 2000). This expression of the test restates the rule set forth in *In re Kahan & Weisz Jewelry Mfg. Corp.*, 508 F.2d 831, 184 USPQ 421, 422 (CCPA 1975) ("[A] correct resolution of the issue can be made only after the primary significance of the mark to the purchasing public is determined …") and *In re Etablissements Darty et Fils*, 759 F.2d 15, 225 USPQ 652, 653 (Fed. Cir. 1985). In *Darty*, the U.S. Court of Appeals for the Federal Circuit considered several factors in determining whether the purchasing public would perceive a proposed mark as primarily merely a surname, including: whether the applicant adopted a principal's name and used it in a way that revealed its surname significance; whether the term had a nonsurname, "ordinary language" meaning; and the extent to which the term was used by others as a surname. 225 USPQ at 653. These inquiries are not exclusive and any of these – singly or in combination – along with any other relevant circumstances may shape the analysis in a particular case. *In re Eximius Coffee, LLC*, 120 USPQ2d at 1278 ("The Board's oft-cited '*Benthin* factors,' *see In re Benthin Mgmt. GmbH*, 37 USPQ2d 1332, 1333-34 (TTAB 1995), are also examples of inquiries that may lead to evidence regarding the purchasing public's perception of a term's primary significance.").

When we consider Section 2(e)(4) as a bar to registration of a term, we consider the impact the term has or would have on the purchasing public because "it is that impact or impression which should be evaluated in determining whether or not the

primary significance of a word when applied to a product is a surname significance." *In re Harris-Intertype Corp.*, 518 F.2d 629, 186 USPQ 238, 239 (CCPA 1975) (quoting *Ex parte Rivera Watch Corp.*, 106 USPQ 145, 149 (Comm'r Pat. 1955)). Whether the primary significance of an applied-for mark is merely that of a surname is a question of fact. *See Darty*, 225 USPQ at 653-54. This question must be resolved on a case-by-case basis. *Id.* at 654; *see also, e.g., In re Pohang Iron & Steel Co.*, 230 USPQ 79, 79 (TTAB 1986).

In this case, Applicant and the Examining Attorney have presented evidence and arguments regarding the following inquiries: whether the term is a surname; whether the term has any recognized meaning other than as a surname; whether the term is the surname of anyone connected with Applicant; whether evidence shows that the term has the structure and pronunciation of a surname; whether there is contextual use related to surname significance; and whether the evidence shows that use of the term as a surname is rare. *See Eximius Coffee*, 120 USPQ2d at 1278; *see also In re Integrated Embedded*, 120 USPQ2d 1504 (TTAB 2016).[3]

II.   Evidence

In the final Office Action dated March 21, 2013, the Examining Attorney included the following evidence drawn from Lexis/Nexis public surname records:

---

[3] No other factors have been discussed by Applicant or the Examining Attorney, nor is there evidence that implicates any other possible factor, inquiry or circumstance.

Search:      Public Records : Surname
Terms:      last-name(belushi) maxresults(500)

**Total number found: 5**

| No. | Name | Address | Phone |
|---|---|---|---|
| 1. | BELUSHI, E | 388 PERKINS AVE WATERBURY, CT 06704-1985 | 203-756-8757 |
| 2. | BELUSHI, JAMES | 9 AZALEA LN CHILMARK, MA 02535-1719 | |
| 3. | BELUSHI, M | ALBANY, OR 97321 | 541-928-4228 |
| 4. | BELUSHI, PHILLIP | SALINAS, CA 93901 | |
| 5. | BELUSHI, WM | TARRAGONA DR SAN DIEGO, CA 92115 | |

LexisNexis, a division of Reed Elsevier

The Examining Attorney also introduced evidence showing the substantial fame of the late comedian and actor John Belushi.



On the day he turned thirty, John starred in America's number-one movie (*Animal House*), starred in the number-one late-night show (*Saturday Night Live*) and had recorded the number-one album (*Briefcase Full of Blues*). All from a guy who was never supposed to make it out from behind the cash register of his family's Chicago diner. How did this Albanian immigrant's son capture a nation's imagination and come to embody all the glory and tragedy of the American dream? It was one high-price, high-speed, short-lived wild ride.

**BELUSHI** is a whirlwind of a book, filled with never-before-seen photos and provocative, intensely personal testimonials by just about every major comedic figure of the last half century. Here is the remarkable and raucous story of a larger-than-life figure who danced out at the precipice of American fame.

" … [T]his surprisingly touching oral history of one of the best-loved American comics portrays John Belushi as a rags-to-riches hero who became a larger-than-life star before overdosing on heroin and cocaine at the Chateau Marmont in 1982. Pisano, Belushi's teenage sweetheart turned wife, compiled the book from a series of interviews conducted shortly after her 33-year-old husband's death, and charts the Belushi myth, as told by Dan Aykroyd, Carrie Fisher and Al Franken, among many others, from John's Chicago childhood through after his death. Highlights include … the evolution of The Blues Brothers from Saturday Night Live skit to major label band; and the harrowing accounts of Belushi's final weeks. Readers will be entertained and moved by this deeply personal account of a talented and complicated man. Family snapshots as well as behind-the-scenes photos complement the story."

"Pisano's second book on the *Saturday Night Live* star … drags in an accomplice to collect quotes from eyewitnesses to John Belushi's life and career, combine them with dozens of photos (including family and college shots), and present a sort of oral history of the comedian's riotous professional rise and abrupt, mortal fall. It's a humorous, nostalgic show-biz-trivia goldmine. The thoughts of such collaborators and costars as Chevy Chase, Tony Hendra, and Robin Williams are mixed with those of pre-*SNL* friends and college acquaintances. Lorne Michaels, Dick Ebersol, and Michael O'Donoghue describe working with Belushi on *SNL* and *National Lampoon* radio projects. John Landis and Tim Matheson contribute movie memories (Belushi "did the entire [*Animal House*] cafeteria line scene in one take"). Dan Aykroyd comments on it all. Al Franken's here, as is his oft-forgotten *SNL* collaborator, Tom Davis. … "[4]

---

[4] http://www.amazon.com/Belushi-A-Biography-Judith-Pisano-ebook/dp/B007GYM86M, attached to the Office Action of August 8, 2012; at 6-9.

**John Belushi** Biography



- John Belushi was an actor and comedian, one of the first performers on "Saturday Night Live" and one half of the Blues Brothers.
- Known for his legendary characters and skits on *Saturday Night Live*, John Belushi imbued his brilliant performances with a manic, boisterous energy that has never seen before or since.
- Belushi made a big splash in the Chicago comedy scene as a member of the legendary Second City improvisational troupe. He wowed audiences with his over-the-top impressions of Marlon Brando, singer Joe Cocker, and others.
- Lorne Michaels asked Belushi to join the cast of his new late night comedy show, *Saturday Night Live*. Premiering on October 11, 1975, *Saturday Night Live* featured nine talented comedians boldly going where television had not gone before. Along with Belushi, there was Dan Aykroyd, Chevy Chase, George Coe, Jane Curtin, Garrett Morris, Laraine Newman, and Gilda Radner. The show soon became a hit and Belushi became one of its emerging stars. Some of his most famous characters were a sword-wielding samurai, a killer bee, and a coneheaded alien named Kuldroth. Belushi also continued making fun of the famous with hilarious takes on the likes of Elizabeth Taylor, Henry Kissinger, Truman Capote, and William Shatner.
- In 1978, Belushi made the move to the big screen with the hit comedy *National Lampoon's Animal House*, directed by John Landis. Playing Bluto Blutarsky, Belushi created one of film's most memorable characters-the thoroughly gross, barely verbal frat brother whose immortal lines included "toga, toga, toga" and "food fight." The havoc created by Bluto and the rest of his Delta House brothers against their school has become one of the most famous college comedies of all time. [5]

In turn, Applicant supplied evidence about John's brother Jim Belushi's decades of celebrity as an actor, comedian, singer, and musician, and his ongoing prominence in the popular media.



**Jim Belushi:** **James Adam** "**Jim**" **Belushi** (born June 15, 1954) is an American actor, comedian, singer, and musician. He is best known for playing the role of James "Jim" Orenthal on the long-running sitcom *According to Jim*, and is the younger brother of late comic actor John Belushi.

From 1977 to 1980, Belushi, like his older brother John Belushi, worked with the Chicago theater group The Second City. During this period, Belushi made his television debut in 1978 … from 1983 to 1985 he appeared on *Saturday Night Live* … many supporting roles and lead roles … He has starred in many films ... His voice work includes an array of titles … animation voice-overs … He also lent his vocal talents for a PC game … TV episodes … In 2002, he was cast as the title role in ABC's *According to Jim.* In 2003, Belushi and Dan Aykroyd released the album *Have Love, Will Travel*, and participated in an accompanying tour. He also performs at various venues nationwide as Zee Blues in an updated version of The Blues Brothers. He released his first book, *Real Men Don't Apologize*, in May 2006 …[6]

---

[5] http://www.biography.com/#!/people/john-belushi-9206502#synopsis, attached to the Office Action of August 8, 2012; at 16-20.

[6] http://www.wikipedia.com, attached to Applicant's response of February 11, 2013; at 5-15.

Neither Applicant nor the Examining Attorney presented any evidence showing that BELUSHI has a meaning other than as a surname. Nor is there any evidence that anyone connected with Applicant has the surname BELUSHI.

The Examining Attorney provided screenshots of Applicant's webpages showing that consistent with the recitation of services, Applicant operates bars, restaurants, comedy clubs, pubs, hotels and hostels in the United Kingdom and elsewhere in Europe. Among the brands touted by Beds & Bars is St. Christopher's Inns, The Flying Pig, Bauhaus, the Winston, and Belushi's bars.[7]

## III.    Arguments

The Examining Attorney contends that BELUSHI is a surname, albeit a rare one. He goes on to argue that the Belushi brothers have received "a great deal of widespread fame, media exposure and publicity over several decades in the television and film industries," and that "their fame greatly increases the public's awareness of the Belushi surname." 15 TTABVUE 9. More specifically, the Examining Attorney argues:

> [A]n issue to be considered in the Section 2(e)(4) analysis is the extent to which media attention or publicity have been accorded to public personalities who have the surname. A surname rarely appearing in birth records may nonetheless appear more routinely in news reports, so as to be broadly exposed to the general public. *In re Gregory*, 70 USPQ2d 1792, 1795 (TTAB 2004).

> In the *Gregory* case, Rogan S. Gregory, an individual, applied to register ROGAN as a mark for various jewelry, handbags and clothing items. The Board held ROGAN to be primarily merely a surname, based in part on the notoriety of former PTO Director James Rogan and a

---

[7] http://www.belushis.com/, attached to the Office Action of August 8, 2012; at 2-5.

handful of other noteworthy individuals with Rogan as a last name. The Board concluded:

> The existence of these individuals with the surname ROGAN leads us to conclude that the name may be rare when viewed in terms of frequency of use as a surname in the general population, but not at all rare when viewed as a name repeated in the media and in terms of public perception. Accordingly, we conclude that ROGAN is not a rare surname.

> Application of the decision in *Gregory* to the present case strongly favors a finding that the primary significance of Belushi to the general public is that of a surname. While there are fewer individuals with the surname, the fame and media attention accorded to individuals who have or have had the surname is rather significant.

Examining Attorney's Appeal Brief, 15 TTABVUE 7-8. The Examining Attorney concludes that John and Jim Belushi's fame greatly increases the public's awareness of the Belushi surname.

Applicant argues that the Examining Attorney's

> reasoning is flawed because all of the Examining Attorney's statements regarding the significance of **BELUSHI'S** are at odds with his conclusion it is primarily merely a surname. Simply put, if **BELUSHI'S** brings to mind the famous Belushi brothers, then it cannot be primarily merely a surname. If it were primarily merely a surname to the public, it would not bring to mind anyone in particular …. The primary significance of Applicant's mark **BELUSHI'S** cannot be a reference to the Belushi brothers while simultaneously being merely that of a surname. It is a logical impossibility."

Applicant's Appeal Brief, 13 TTABVUE 6. Applicant's other main point focuses on the "extreme rarity" of the surname: "because there are only five people in the entire United States with the surname Belushi, substantially no one will be adversely affected by the registration of Applicant's mark **BELUSHI'S**." 13 TTABVUE 7.

IV.    Analysis

The Examining Attorney has demonstrated that BELUSHI is an actual surname; and there is no evidence showing that it has any alternative meaning.

The Examining Attorney contends that BELUSHI has the structure and pronunciation of a surname; however, his position is unsupported by any evidence. *See Eximius Coffee*, 120 USPQ2d at 1280 (reference to similar purported surnames "without proving that they are surnames, without showing how common such surnames . . . are, and without providing some other objective evidence of how members of the public perceive the structure and sound of ALDECOA is not sufficient to enable us to determine that ALDECOA has a structure and pronunciation similar to that of other purportedly common surnames"). With respect to this difficult type of argument, we would require evidence, whether from Applicant or the Examining Attorney, bearing on how members of the public would perceive the structure and sound of BELUSHI and whether they would be likely to perceive the proposed mark as similar or dissimilar in structure and sound to other surnames, common words or coined terms.

Insofar as contextual clues are concerned, the mark **BELUSHI'S** includes the surname BELUSHI in the possessive form (*i.e.*, with an apostrophe "s"). This is consistent with perception of the term as a surname. *Azeka Building Corp. v. Bryan Kenji Azeka*, ___ USPQ2d ___, Opp. No. 91218679 (TTAB May 3, 2017); *In re Binion*, 93 USPQ2d 1531, 1537 (TTAB 2009).

At the outset of our consideration of the rarity of the surname as viewed against the backdrop of public exposure to the surname, we note, on the one hand, that

according to the Lexis/Nexis evidence supplied by the Examining Attorney, only five people in the U.S. are named BELUSHI, establishing that it is an exceedingly rare surname. On the other hand, the celebrity of John Belushi and the continuing media attention on Jim Belushi support a finding that a substantial portion of Americans know BELUSHI to be a surname.

Even a rare surname may be held primarily merely a surname if its primary significance to purchasers is that of a surname. In this case, the rare surname BELUSHI is so well-known as a result of media publicity that it would be immediately recognized as a surname. *See In re Gregory*, 70 USPQ2d at 1795. The relevant question is not simply how frequently a surname appears, however, but whether the purchasing public for Applicant's services is more likely to perceive Applicant's proposed mark as a surname rather than as anything else. How frequently it has been exposed to the purchasing public as a surname, thereby causing consumers to recognize it as such, is also of relevance in this case. In *In re Gregory, supra*, for example, the record revealed appreciable media exposure afforded to individuals bearing the surname "Rogan," including Baseball Hall of Famer Wilber Rogan, author Barbara Rogan, actors Seth Rogan and Joe Rogan, and former Congressman and USPTO Director James Rogan. Based on such evidence of wide public exposure, the Board concluded that "the name [Rogan] may be rare when viewed in terms of frequency of use as a surname in the general population, but not at all rare when viewed as a name repeated in the media and in terms of public perception." *Id.* at 1795.

Similarly, in this case, although BELUSHI is a rare surname in terms of the number of people in the U.S. with that name, it is anything but rare when we consider how many consumers have been exposed to it as a surname, often repeatedly, over the years. Simply put, the evidence shows that John Belushi was a major celebrity, and that Jim Belushi has enjoyed his own success. Indeed, the Examining Attorney's evidence "reflect[s] the broad exposure that would place a rarely encountered surname more frequently in the public eye." *In re Eximius Coffee*, 120 USPQ2d at 1281 (and cases cited thereat). *See Gregory*, 70 USPQ2d at 1795.

Applicant argues to the contrary, contending that this case is more akin to *In re Pyro-Spectaculars Inc.*, 63 USPQ2d 2022 (TTAB 2002). There the Board concluded that the applicant was entitled to registration of SOUSA as a trademark for fireworks and entertainment services featuring pyrotechnics, even though the Examining Attorney established a prima facie case that the mark was primarily merely a surname by showing that SOUSA is a surname in current use in the United States. In that case, the surname refusal was reversed based on the applicant's evidence, including news articles showing the continuing fame of the historical band leader and composer John Philip Sousa, because the applicant's fireworks and shows featuring pyrotechnics were the types of goods and services that potential purchasers would associate with patriotic events, figures, and music, and because the primary significance of SOUSA, as used in connection with the applicant's goods and services, was as the name of a person well known in United States history for his patriotic music. Here, by contrast, although John and Jim Belushi are widely known to Americans, the evidence does not show that they qualify as historical figures closely

associated with Applicant's services in the manner shown in *Pyro-Spectaculars. Id.* at 2024 ("[I]n cases involving historical names, the Board has drawn a line between those names considered so widely recognized as to be 'almost exclusively associated in terms of commercial impressions with the historical figures' and those names 'semihistorical in character.' . . . But even when such a line was drawn, the ultimate issue to be determined was still that of the primary significance of the mark in question to the purchasing public." (quoting *In re Pickett Hotel Co.*, 229 USPQ 760, 761 (TTAB 1986)).

Examining the entire record to determine the primary significance of the term **BELUSHI'S**, we find that the Examining Attorney has demonstrated that BELUSHI is a surname, which while rare has nevertheless enjoyed widespread public exposure, given the Belushi brothers' fame. Further, we find that the term BELUSHI has no other "ordinary language meaning," and that Applicant has failed to demonstrate that the term has another significance that is its primary significance as perceived by the public. We conclude, therefore, that **BELUSHI'S** is primarily merely a surname and that the refusal to register the mark on the Principal Register must be affirmed.

**Decision**: The refusal to register Applicant's proposed mark **BELUSHI'S** on the Principal Register pursuant to Section 2(e)(4) of the Trademark Act is affirmed.

Applicant's alternative request to amend this application to one seeking registration on the Supplemental Register is accepted and will be entered. A registration on the Supplemental Register will issue in due course.